IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

J.M., by and through her
Parents, Dana M. and Stephen M., and Dana
M. and Stephen M., individually

    Plaintiffs,

  v.

CHRISTINA SCHOOL DISTRICT,

    Defendant.

Civil Action No. 23-0559-RGA

## MEMORANDUM OPINION

Caitlin Elizabeth McAndrews, MCANDREWS, MEHALICK, CONNOLLY, HULSE & RYAN, P.C., Wilmington, DE; Jacqueline C. Lembeck (argued), MCANDREWS, MEHALICK, CONNOLLY, HULSE & RYAN, P.C., Berwyn, PA,

  Attorneys for Plaintiffs.

Jennifer Marie Kinkus (argued), YOUNG, CONAWAY, STARGATT & TAYLOR LLP, Wilmington, DE,

  Attorney for Defendant.

December 17, 2024

1

*[signature: Richard G. Andrews]*

**ANDREWS, UNITED STATES DISTRICT JUDGE:**

Plaintiffs J.M. and her parents ("Parents") appeal to this Court from an administrative Hearing Panel's denial of tuition reimbursement, an equitable remedy under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400, *et seq.* Plaintiffs also seek remedy under Section 504 of the Rehabilitation Act of 1973 ("Section 504"), 29 U.S.C. § 794; the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101, *et seq.*; the federal and state implementing regulations of the foregoing statutes; and 14 Del. Admin. C. § 922 *et seq.* (D.I. 18 at 1).[1] Before me are Plaintiffs' Motion for Judgment on the Administrative Record (D.I. 17) and Defendant Christina School District's motion for the same (D.I. 19). I have considered the parties' briefing. (D.I. 18, 21) (Plaintiffs' briefs); (D.I. 20) (Defendant's brief). I heard oral argument on November 12, 2024. (D.I. 23). For the reasons set forth below, Defendant's motion is GRANTED, and Plaintiffs' motion is DENIED.

## I. BACKGROUND

J.M. is a minor diagnosed with a neurodevelopmental disorder, ADHD, and Other Specified Anxiety Disorder. (D.I. 18 at 2). She was born with congenital heart disease, which has necessitated continued medical care. (*Id.*). J.M.'s conditions led to difficulty in math, reading, and writing (*id.* at 1), which prompted the District to identify J.M. as requiring special education under the IDEA in her fifth grade. (*Id.* at 2). A year later, frustrated with J.M.'s lack of progress in the District, J.M.'s parents transferred her to The Pilot School ("Pilot"), a

---

[1] Plaintiffs barely brief anything other than the IDEA. Plaintiffs make no independent argument in support of tuition reimbursement under the ADA or Section 504. Plaintiffs make no argument at all concerning Delaware law. The Delaware law argument is forfeited. *See Higgins v. Bayada Home Health Care Inc.*, 62 F.4th 755, 763 (3d Cir. 2023) ("[A]rguments raised in passing . . . but not squarely argued[] are considered [forfeited.]" (quoting *John Wyeth & Bro. Ltd. v. CIGNA Int'l Corp.*, 119 F.3d 1070, 1076 n.6 (3d Cir. 1997)).

"specialized school in Wilmington, Delaware for students with learning difficulties." (*Id.* at 6). There, she was placed in a cohort of approximately six students, received individualized services, and benefitted from weekly speech-language therapy, occupational therapy, and physical therapy. (*Id.*) Her performance in math and reading improved. (*Id.*) J.M. remained at Pilot until eighth grade, after which she attended Centreville Layton School ("Centreville"), a private high school in Wilmington, Delaware offering classes of approximately seven to eight students and individualized accommodation plans for each student. (*Id.* at 9).

Meanwhile, the District offered an alternative: for each of the 2021–2022 and 2022–2023 school years in dispute, the District offered J.M. an Individualized Education Program ("IEP"), a statement of the services, modifications, and supports to be provided for J.M. in public school. 20 U.S.C. § 1414(d)(1)(A). The purpose of an IEP is to ensure that a student receives a free appropriate public education ("FAPE") as required by the IDEA. 20 U.S.C. § 1414(9). Though each IEP was directed toward J.M.'s particular strengths and weaknesses, containing goals for "written expression, reading comprehension, math problem solving and listening comprehension" (D.I. 20 at 19), the services in each IEP differed significantly from those available at Pilot and Centreville. Rather than being in a small group, J.M. would be placed in a general education environment ("A" setting) of thirty-five to forty students (D.I. 20 at 11),[2] where she would be provided with Accommodations, Modifications, and Supports ("AMS") such as preferential seating, specially adapted learning tools, and teacher check-ins, accompanied with ten- to fifteen-minute small group instruction sessions. (D.I. 20 at 8–11, 13–14). Core

---

[2] Other settings relevant to this opinion include the B, C, and D settings. A "B" setting includes services provided both in separate special education classes and the typical "A" setting; a "C" setting emphasizes separate education at the same facility; a "D" setting is a separate school. (D.I. 16-4 at 24 of 39).

3

classes would be co-taught by a certified general education teacher and a certified special education teacher. *See* Original Administrative Record ("AR")[3] at DOE000235, DOE000282, DOE001446.[4]

J.M.'s parents rejected both IEPs and filed a Due Process Complaint with the Delaware Department of Education seeking tuition reimbursement for J.M.'s education at Pilot and Centreville for the 2021 and 2022 school years. (D.I. 18 at 2). Following an evidentiary hearing held across multiple days, an independent administrative hearing panel ("Panel") found that the District had offered J.M. a FAPE and that J.M.'s parents were not entitled to tuition reimbursement. (D.I. 20 at 1). J.M.'s parents appeal the Panel's decision, and both parties have moved for Judgment on the Administrative Record. (D.I. 17, 19).

## II. LEGAL STANDARD

Under the IDEA, J.M. is entitled to a FAPE. 20 U.S.C. § 1409(9) & 34 C.F.R. § 300.17. To ensure the appropriateness of the education provided, the IDEA requires school districts to form IEPs that implement instructional programs tailored to the student's ability and skills. *J.D.G. v. Colonial Sch. Dist.*, 748 F. Supp. 2d 362, 367 (D. Del. 2010). An IEP must "consist[ ]

---

[3] A notice of filing of the original administrative record is docketed at D.I. 6, but the original administrative record itself is filed only in paper and is not available electronically. Cites to the original administrative record use the "DOE" numbers at the top-right corner of each page. The parties filed an electronic supplement to the administrative record (D.I. 16) that contains supplemental exhibits and improved scans of certain exhibits in the original administrative record. Where possible, citations are to D.I. 16.

[4] The parties dispute whether all or just some of J.M.'s core classes would be co-taught. (D.I. 23 at 50:10–16, 52:3–14). The Panel was not asked to address this issue. The Panel's opinion therefore did not resolve it. The Panel'sl opinion says that J.M. would be placed in an "inclusion setting." AR at DOE000040. To the extent that resolving this dispute depends on making determinations as to witness credibility, *see, e.g., id.* at DOE001818, I am ill-equipped to make this determination, not having seen the witnesses testify. For the reasons outlined in this opinion, however, I find that regardless of whether the District offered J.M. a co-taught setting for all or just some of her classes, each IEP constituted an offer of FAPE.

of a specific statement of a student's present abilities, goals for improvement of the student's abilities, services designed to meet those goals, and a timetable for reaching the goals by way of the services." *Holmes v. Millcreek Twp. Sch. Dist.*, 205 F.3d 583, 589 (3d Cir. 2000). IEPs must be "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist. RE-1*, 580 U.S. 386, 399 (2017). The central inquiry is "whether the IEP is *reasonable*, not whether the court regards it as ideal." *Id.* The question of whether an IEP is appropriate is a question of fact. *S.H. v. State-Operated Sch. Dist. of City of Newark*, 336 F.3d 260, 270 (3d Cir. 2003).

If the parents of a child with a disability do not agree with the IEP offered by a school district, they may request a due process hearing. 20 U.S.C. § 1415(f)(1). If a party disagrees with the result of the administrative review process, the party may appeal that result to the District Court. 20 U.S.C. § 1415(i)(2)(A). The party challenging the IEP carries the burden of proof. *Schaffer v. Weast*, 546 U.S. 49, 62 (2005). This Court applies a "modified de novo" standard of review to the administrative panel's decision. *S.H.*, 336 F.3d at 270. Under that standard, this Court must make its own findings of fact by a preponderance of the evidence, but must give "due weight" to the panel's findings of fact. *Shore Reg'l High Sch. Bd. of Educ. v. P.S. ex rel. P.S.*, 381 F.3d 194, 199 (3d Cir. 2004). "Due weight" means that "[f]actual findings from the administrative proceedings are to be considered prima facie correct," and "[i]f a reviewing court fails to adhere to them, it is obliged to explain why." *Id.* (citations omitted). The Panel's credibility determinations of live witness testimony are given "special weight," meaning that the Court must accept those determinations "unless the non-testimonial, extrinsic evidence in the record would justify a contrary conclusion." *Id.* (citation omitted). "[T]he word

5

'justify' demands essentially the same standard of review given to a trial court's findings of fact by a federal appellate court[,]" *id.*, that is, clear error.

Were the Court to determine that the District did not offer a FAPE, two questions would remain: first, whether the private schools at which J.M.'s parents placed her were appropriate; second, whether equitable considerations justify denying reimbursement. *See Florence Cnty. Sch. Dist. Four v. Carter by & through Carter*, 510 U.S. 7, 15–16 (1993); *Sch. Comm. of Town of Burlington, Mass. v. Dep't of Educ. of Mass.*, 471 U.S. 359, 369–70 (1985); *C.H. v. Cape Henlopen Sch. Dist.*, 606 F.3d 59, 67 (3d Cir. 2010); 20 U.S.C. § 1412(A)(10)(C)(iii).

## III. DISCUSSION

### A. Both the 2021 and 2022 IEPs were Offers of a FAPE.

Per *Endrew F.*, the primary question before this Court is whether the 2021 and 2022 IEPs were "reasonably calculated to enable [J.M.] to make progress appropriate in light of [her] circumstances." 580 U.S. at 399. I conclude that they were. Both the 2021 and 2022 IEPs offered services directed explicitly toward J.M.'s primary areas of weakness, including, among others, written expression, reading comprehension, math problem-solving, visual perception, attention to task, and task anxiety. (D.I. 16-4 at 10–21 of 39; D.I. 16-6 at 12–21 of 24). After considering the evidence, which included witness testimony, psychoeducational evaluation, AR at DOE000025, "records from [Pilot,] input from her teachers, a classroom observation, and input from her physical, speech, and occupational therapists," *id.* at DOE000046, the Panel determined that each IEP offered services tailored to J.M.'s individual circumstances and needs, *id.* at DOE000048.

Parents argue that the available data does not support the District's recommendations to reduce the level of services J.M. was to receive. (D.I. 18 at 16). The Parents' arguments,

6

however, are not sufficient to meet Parents' burden of demonstrating that the IEPs offered were unreasonable.

First, Parents argue that J.M.'s evaluations demonstrate that J.M. requires a higher level of services than the District's IEPs offered. (*Id.* at 16–17). Two evaluations are most relevant: a neuropsychological evaluation conducted in July of 2017 by Dr. Maya Zayat, a licensed psychologist with Nemours Alfred I. duPont Hospital for Children (*id.* at 3) ("Nemours Evaluation"), and an Evaluation Summary Report issued in October 2020 by the District. (*Id.* at 7) ("2020 ESR"). The Nemours Evaluation recommended "substantial individualization and direct services," including small group instruction, along with other interventions such as additional time to complete tasks, frequent brief breaks, and preferential seating. (D.I. 16-1 at 7–9). The 2020 ESR took note of J.M.'s performance across a range of areas, including listening comprehension, written expression, and math concepts and applications, in which J.M. scored in the 0.2, 7th, and 10th percentiles, respectively (D.I. 18 at 7, citing AR at DOE000174–175), and concluded that J.M. suffered from a learning disability in reading comprehension, math problem solving skills, listening comprehension, and written expression. (D.I. 18 at 7, citing AR at DOE000183–185).

It is incorrect to suggest, as Parents do, that the evaluations demonstrate that J.M. required a small group setting (*id.* at 17) to satisfy the IDEA. First, this mischaracterizes the Nemours Evaluation, which only states that J.M. "would benefit from" a smaller class size. (D.I. 16-1 at 8). Other recommendations in the Nemours Evaluation, like preferential seating, clearly contemplate a larger class environment. (*Id.* at 9). The 2020 ESR, for its part, did not make specific recommendations as to class size or other AMS. AR at DOE000157–187. Regardless, even if the recommendations included in the Nemours Evaluation were framed as a mandate, the

7

District would not necessarily be required to include every recommendation in the IEPs. The IEP must merely be reasonable, not ideal. *Endrew F.*, 580 U.S. at 399.

Second, Parents point to J.M.'s success at Pilot as evidence that a reduction in services was unjustified in the record. (D.I. 18 at 17). It is true that J.M. showed progress at Pilot (D.I. 16-4 at 2; D.I. 16-20 at 2–5; D.I. 16-21 at 2–28), but this is not the standard for deciding whether the District's proposed IEPs constituted a FAPE. Nowhere does the IDEA suggest that public school districts' IEPs be measured against the benchmark of private, specialized academic institutions—again, the "ideal" is not the relevant standard. *Endrew F.*, 580 U.S. at 399. "The focus must remain on whether the program the District offered was appropriate, not whether [the private school's] program was better." *Ruari C. by & through Ronan C. v. Pennsbury Sch. Dist.*, 2023 WL 5339603, at *7 (E.D. Pa. Aug. 18, 2023), *aff'd*, 2024 WL 3633700 (3d Cir. Aug. 2, 2024).

Further deflating Plaintiffs' point is that one of their strongest concerns with the District's IEPs, as compared to Pilot's, is class size and the general education setting. (D.I. 18 at 12). While it may be true that J.M. would be better served individually in a smaller setting, it is also true that the IDEA exhibits a strong statutory preference for integrating children with disabilities into the general educational setting, approving removal from that setting only "when the nature or severity of the disability of a child is such that" integration "cannot be achieved satisfactorily." 20 U.S.C. § 1412(a)(5). "[F]or most children, a FAPE will involve integration in the regular classroom and individualized special education calculated to achieve advancement from grade to grade." *Endrew F.*, 508 U.S. at 401. As the Third Circuit has noted, the IDEA's tension between individualized programs and the preference for "mainstreaming" is often best resolved through the use of "supplementary aids and services." *Oberti by Oberti v. Bd. of Educ.*

8

*of Borough of Clementon Sch. Dist.*, 995 F.2d 1204, 1214 (3d Cir. 1993) (citation omitted). The District employed just such an approach here.

Third, Parents contrast J.M.'s success at Pilot with her struggles in the District, arguing that if J.M. did not succeed in the general education environment before, she will not in the future. (D.I. 18 at 19). This argument is unpersuasive for two reasons. One, Parents' assessment of J.M.'s academic performance is not equivalent to the standard of services the District is legally obligated to provide under the IDEA. "[The student's] success at [the private school] is relevant, but only to the extent that it shows [the student's] abilities and thus the level of progress the District should have strived for." *A.M. v. Wallingford-Swarthmore Sch. Dist.*, 629 F. Supp. 3d 285, 299 (E.D. Pa. 2022) (citations omitted). Two, past is not always prologue—not only are there significant differences between the 2017 IEP and the 2021 and 2022 IEPs (*compare* D.I. 16-2 *with* D.I. 16-4, 16-6), but J.M.'s circumstances also changed in the interim. The District considered reports from Pilot indicating J.M.'s progress when it crafted the 2021 and 2022 IEPs. *See, e.g.*, AR at DOE001436 (testimony from the District's Director of Special Services noting the role J.M.'s progress at Pilot played in determining the extent of physical therapy in the 2021 IEP), DOE001154–1157 (testimony from Newark High School's Special Education Coordinator noting math and reading "progress updates" from Pilot that the 2022 IEP team used). For example, the 2022 IEP relied upon reports from five different teachers at Pilot regarding J.M.'s academic progress (D.I. 16-6 at 5 of 24), an Occupational Therapy report regarding J.M.'s visual sequential memory (*id.* at 8 of 24), and both a Triennial Assessment and two Physical Therapy Progress Reports regarding J.M.'s physical mobility and balance. (*Id.* at 8–9 of 24).

Fourth, Parents make a related argument that the District's IEPs offered no "transition plan" through which J.M.'s AMS would be gradually phased out. (D.I. 18 at 19). Parents point

to testimony from Newark High School's Special Education Coordinator suggesting that when removing supports, "[one] usually phase[s] the supports out, [rather than] delet[ing] them all at one time." (*Id.*; AR at DOE001241). This argument fails for three reasons. First, Parents overstate the Coordinator's testimony, which is consistent with the District's IEPs. Though the IEPs represent a significant cutback in J.M.'s AMS, the Coordinator was correct that J.M.'s AMS were not deleted all at one time—as outlined above, both IEPs retained significant AMS to aid in J.M.'s education. Second, each IEP included interventions that would aid in J.M.'s transition to public school, including consultative physical therapy to assist in J.M.'s transition "to a large multilevel environment" (D.I. 16-4 at 6 of 39 (2021 IEP), D.I. 16-6 at 19 of 24 (2022 IEP)), a gradual increase in task duration depending on J.M.'s success in the A setting (D.I. 16-4 at 13 of 39), and a range of AMS intended to ameliorate task anxiety, much of which would be attributable to J.M.'s new environment (D.I. 16-4 at 14 of 39 (2021 IEP), D.I. 16-6 at 21 of 24 (2022 IEP), AR at DOE001610 (testimony of clinical psychologist as to J.M.'s tendency to be overwhelmed by large groups)). If these interventions proved insufficient, a Special Education Coordinator monitoring J.M.'s progress would be able to schedule an IEP revision. AR at DOE 001143–1144. Third, Parents cite no authority suggesting that inclusion of a transition plan is a *per se* requirement for providing a FAPE under the IDEA. Especially considering testimony from the District's psychologist that placement in a larger educational environment would be beneficial to J.M.'s social and emotional health, *see* AR at DOE000779, the District's offered means for transitioning J.M. to that environment did not preclude a finding of FAPE.[5]

---

[5] I also note that there is seemingly no record of Parents' objection to the lack of transition plan specifically in either IEP. At oral argument, counsel for Parents represented that Parents had raised such an issue during the IEP meetings with the District (D.I. 23 at 14:9–12, 54:3–9), but the citation provided by counsel (*see* AR at DOE000537) is to J.M.'s closing brief in the Due Process Hearing—not to any evidence that parents raised this issue at the IEP meetings.

Fifth, Parents take issue with the Panel opinion's lack of citations in its analysis and discussion. (D.I. 18 at 22). I agree with Parents that the Panel's opinion could be improved, but I disagree that its opinion is so lacking as to find no support in the record. The lack of citations in the Panel opinion's discussion section bears no connection to the merits of the Panel's conclusion, which was based on extensive findings of fact for which the Panel diligently provided citations. AR at DOE000023–41. It is clear that many of these findings of fact support the Panel's conclusion. For example, the Panel noted J.M.'s strong performance at Pilot, *id.* at DOE000025, her "unremarkable" testing with respect to "social, emotional, and behavioral functioning," *id.* at DOE000028, the 2021 IEP team's review of records from Pilot School and J.M.'s assessments and evaluations, *id.* at DOE000034, and each IEP's terms as they related to J.M.'s specific needs, *id.* at DOE000030–34, DOE000036–41. Plaintiffs challenge none of these findings of fact, or any of the other findings of fact on which the Panel based its decision. Applying the modified de novo standard, *see S.H.*, 336 F.3d at 270, I accept the Panel's findings.

Sixth, Parents assert that the following quote from the Panel's decision demonstrates that the Panel's decision was based on "patently incorrect" (D.I. 18 at 21) conclusions: "While the record is devoid of any evidence to support a finding that [J.M.] would thrive in any setting other than 'A,' testimony of a number of credible witnesses support a finding that she could actually *regress* in any alternative setting." AR at DOE000045. According to Parents, the record is replete with evidence of J.M.'s ability to thrive in non-A settings—the most obvious being her successful tenure at Pilot. (D.I. 18 at 21). With that being the case, Parents argue, I should overturn the Panel's opinion. I disagree. Parents read the Panel's comment out of context to suggest that it found any non-A setting to be inappropriate. The Panel's comment, however—in fact, its entire opinion—is unconcerned with non-A settings. The Panel's inquiry was whether

11

the setting included in the IEPs—the A setting—necessarily precluded a FAPE. With that being the case, the more natural interpretation of the Panel's comment (as poorly phrased as it may be) is that the record lacks any evidence showing that J.M. required a non-A setting to thrive academically. I am inclined to view the Panel's comment this way because, at multiple points in the opinion, including the immediately preceding paragraph, the Panel acknowledges J.M.'s progress at Pilot. *See, e.g.*, AR at DOE000025, DOE000036, DOE000045. It would be strange for the Panel to assert that there was no evidence of the same thing the Panel repeatedly acknowledged.

The Panel buttresses its conclusion in the challenged sentence by explaining that not only was the A setting appropriate, any other setting may have disserved J.M., as explained by credible witnesses. Though the Panel does not explain which witnesses those may be, I can fairly conclude that the Panel is referring to the District's school psychologist, *see* AR at DOE000778–781, the District's Director of Special Services, *see id.* at DOE001441–1443, and a Special Education Coordinator, *see id.* at DOE001360–1361, each of whom commented on the appropriateness of the A setting in comparison to its alternatives. The Panel's crediting of these witnesses' testimony receives "special weight." *Shore Reg'l High Sch. Bd. of Educ.*, 381 F.3d at 199. I decline to disregard the Panel's entire finding on the basis of one errant comment for which a reasonable interpretation presents itself.[6]

---

[6] Plaintiffs argue that the Panel erred as a matter of law by allowing after-the-fact testimony to retrospectively alter the contents of the IEPs. (D.I. 18 at 20–21). It is true that IEPs must be assessed based on the written document. *See D.S. v. Bayonne Bd. of Educ.*, 602 F.3d 553, 564–55 (3d Cir. 2010) (citing *Susan N. v. Wilson Sch. Dist.*, 70 F.3d 751, 762 (3d Cir. 1995)). Plaintiffs cite to just two examples of such testimony, neither of which seems particularly significant. (D.I. 18 at 23, citing AR at DOE001477 ("60 day temporary IEP"); AR at DOE001461 (time telling can be taught in eighth grade math class)). There is absolutely no indication in the Panel's Decision that it relied on such testimony. Thus, the identified testimony did not amend or alter the IEPs.

12

To conclude, Plaintiffs' argument boils down to asserting that the District's IEPs are simply not good enough. The Panel, considering the concrete goals set by each IEP, the numerous Accommodations, Modifications, and Supports designed to support J.M. in the general education environment, the small-group and one-on-one instruction time set aside for J.M. throughout the week, as well as the Panel's own assessment of the evidence before it, decided otherwise. *See* AR at DOE000048. Short of "substitut[ing] [my] own notions of sound educational policy for those of local school authorities," *S.H*, 336 F.3d at 270, I see no basis for departing from the Panel's determination. Because I find that the 2021 and 2022 IEPs offered a FAPE, it is unnecessary to determine whether Pilot and Centreville were appropriate placements, or whether equitable considerations justify denying relief. *See Carter*, 510 U.S. at 15–16; *Burlington*, 471 U.S. at 369–70.

## B. For the Foregoing Reasons, Plaintiffs' § 504 and ADA Arguments Fail.

In addition to seeking relief under the IDEA, Plaintiffs have brought their claim under § 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 and the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101, *et seq*. These claims rise and fall with the Plaintiffs' IDEA claim. Per *W.B. v. Matula*, there are "few differences, if any, between IDEA's affirmative duty and § 504's negative prohibition. Indeed, the regulations implementing § 504 adopt the IDEA language." 67 F.3d 484, 492 (3d Cir. 1995) (citing 34 C.F.R. § 104.33(a)).[7] Furthermore, as Plaintiffs concede, their ADA claim is contingent on their § 504 claim. (D.I. 18 at 16).

---

[7] Parents cite one case, *Lauren G. ex rel. Scott G. v. W. Chester Area Sch. Dist.*, 906 F. Supp. 2d 375 (E.D. Pa. 2012), in which a court granted tuition reimbursement under § 504 during a period for which no relief was granted under the IDEA. That case rested, however, on a determination that the statute of limitations for relief under the IDEA had run, not a substantive difference between the standards for relief under § 504 and the IDEA. *See id.* at 396 n.15.

## IV.   CONCLUSION

The District's 2021 and 2022 IEPs both offered a free appropriate public education under the Individuals with Disabilities Education Act. Both are the result of careful consideration by the District of the available information, and they are reasonably calculated to enable J.M.'s academic progress.

An appropriate order will follow.